

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

U.S. DISTRICT COURT - N.D. OF N.Y.
**F I L E D**
AUG **1 8** 2021
AT_____ O'CLOCK
John M. Domurad, Clerk - Albany

Zelma Rivas, Plaintiff(s)                   )
                                            )   **Civil Case No.:** 1:21-cv-932
                                            )                    (BKS/DJS)
            vs.                             )
                                            )   **CIVIL**
                                            )   **RIGHTS**
New York Lottery, Defendant(s)              )   **COMPLAINT**
            and,                            )   **PURSUANT TO**
The Office of Temporary and Disability      )   **42 U.S.C. § 1983**
Assistance                                  )
                                            )

Plaintiff(s) demand(s) a trial by: XX JURY ___ COURT (Select **only** one).

Plaintiff(s) in the above-captioned action, allege(s) as follows:

### JURISDICTION

1.  This is a civil action seeking relief and/or damages to defend and protect the rights guaranteed by the Constitution of the United States. This action is brought pursuant to 42 U.S.C. § 1983. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(3) and (4) and 2201.

### PARTIES

2.  Plaintiff:      **Zelma Rivas**

    Address:     1516 Huntridge Drive, Post Office Box 4478

                 Clifton Park, New York 12065

    Additional Plaintiffs may be added on a separate sheet of paper.

3.  a.  Defendant:         New York Lottery (NYL)

        Official Position:    New York Lottery (NYL) management.

        Address:           1 Broadway Center
                           Schenectady, New York 12305

4.  a.  Defendant:              Office of Temporary and Disability Assistance (OTDA)

    Official Position:          Office of Temporary and Disability Assistance (OTDA)
                                management and (OTDA) employees.

    Address:                    40 North Pearl Street,
                                Albany, New York 12243

5.  Plaintiff is a career tenured civil service employee of the State of New York. The plaintiff
    worked without personnel problems until she began working for the Defendants in
    November 1995. Immediately after the plaintiff was hired in December 2012 by (OTDA), she
    was stalked, threatened, harassed and bullied on an ongoing basis. Plaintiff pleads and
    establishes sufficient facts to make out a prima facie case under Title VII and 42 U.S. Code §
    1983.

6.  The evidence provided herewith, suggests the workplace at (OTDA) is permeated with
    discriminatory conduct so severe and pervasive, the conditions of the plaintiff's
    employment is permanently altered. (OTDA) management is aware of the ongoing
    discrimination and harassment but elected to take no action and closed all avenues for
    complaint. The severity and pervasiveness of the discriminative conduct supports a Title VII
    claim. The stalking is threatening, dangerous and humiliating. The stalking interferes with
    the plaintiff's work and continues to cause the plaintiff psychological harm. The workplace
    at (OTDA) is sufficiently hostile and to permit an actionable claim. The workplace at the
    (NYL) was sufficiently hostile to permit an actionable claim.

7.  On February 1, 2010, Fitzmaurice and Ms. Julie Barker, (NYL) attorney, told the plaintiff, the
    letter she wrote to the Governor, beseeching his assistance, was forwarded to (NYL)

management. Fitzmaurice and Barker told the plaintiff, the Governor ordered her personally fired because he does not want minorities reporting discrimination to his office. On February 1, 2010, the Defendants retaliated by escorting the plaintiff out of the (NYL) and ordering her to be examined by (EHS). The plaintiff was found fit for duty by the (EHS). The Defendants ordered the plaintiff to return to work on April 1, 2010. When the plaintiff arrived to work, Fitzmaurice and Barker proceeded to interrogate the plaintiff.  CSEA Union Representatives were already in attendance at the interrogation, having already been summoned by Fitzmaurice. The Defendants used the information from the Interrogation against the plaintiff in the disciplinary proceeding. The Defendant's violated the Agreement between the Civil Service Employees Association (CSEA) and the State of New York, ARTICLE §33.2 Employee Rights "No employee shall be required to submit to an interrogation by a department or agency if the information sought is for use against such employee in a disciplinary proceeding pursuant to this article".

8. On June 9, 2010, Charles Essepian, Administrative Law Judge (ALJ), State of New York, Unemployment Insurance Appeal Board. Essepian, states "The claimant was employed for a New York State Department as a secretary for approximately 14 and one-half years until February 1, 2010. The claimant worked full time and was a member of a union with contractual relations with the employer. Over the course of the claimant's employment, the claimant reported several incidences that she believed violated her human rights, civil rights, employee rights and rights that she had through her union. On January 23, 2010, the claimant wrote a letter to her employer notifying them that her complaints have gone unanswered and that there are continuing acts by her employer causing her and her family

3

to suffer. The claimant cited specific acts of what she believed were violations of her rights, discrimination, harassment among other things. As a result of the letter, the employer suspended the claimant without pay beginning February 2, 2010, and required her to get a mental health evaluation to see if she was fit for work. The claimant complied with the employer's directive and after undergoing her evaluation's was found to be fit for work. By Confidential Memorandum dated March 26, 2010 the claimant was order to return to the work site on April 1, 2010, where she would undergo an interrogation by the employer. The memorandum notified the claimant that "Your participation in the interrogation is mandatory; failure to appear may result in disciplinary action against you, including termination of your services." No other instructions or warnings were provided to the claimant. On April 1, 2010, the claimant reported to the interrogation and was represented by two union officials. At the interrogation the human resource manager for the department for whom the claimant worked as (asked) the claimant a series of questions about statements and accusation made in her January 23, 2010 (letter to the Governor of New York State). The claimant replied to all questions asked of her except one "no comment". The claimant was subsequently discharged for failing to cooperate in the interrogation process on April 1, 2010. Opinion: Pursuant to Labor Law § 593 (3), a claimant is disqualified from receiving benefits after having lost employment through misconduct in connection with that employment. Pursuant to Labor Law § 527, the wages paid in such employment cannot be used to establish a future claim for benefits. The credible evidence establishes that the claimant was discharged for failing to cooperate in an interrogation with her employer on April 1, 2010. Based on the testimony and evidence before me, I find

that there is no evidence that the claimant was aware that her failure to cooperate in the interrogation would be grounds for dismissal. Significantly, the claimant was only placed on notice by letter dated March 26, 2010, that her participation at the interrogation was mandatory. Furthermore, the transcript from the interrogation on April 1, 2010 is devoid of warning the claimant that her failure to cooperate or failure to answer questions could or would result in her dismissal. Accordingly, I find that the claimant's actions do not rise to the level of misconduct under the Unemployment Insurance Law. Decision: The initial determination is overruled. The claimant is allowed benefits with respect to the issues decided herein.

9.  Kim Hall, a minority, told the plaintiff immediately after she was terminated, the Defendants went after her. Hall worked in the personnel office with Fitzmaurice. Hall told the plaintiff, her work was sabotaged, the computer was sabotaged, the numbers in her work were changed. The Defendants wanted Hall to think she was going crazy. Due to the stress, Hall kept taking time off work. Hall even went to see a professional to talk to. Hall worked 22 years for the State, she earned $66,000 a year as a grade 18. In May 2010, Hall resigned from the (NYL) due to the stress. Shortly thereafter, Hall asked the Defendants for her job back because she has children. The Defendants refused to rehire or reinstate Hall to her former position. The Defendants hired a Caucasian to fill Hall's previous position. Hall had to apply for SNAP benefits at the Department of Social Services.

10. In October 2010, at Arbitration, Fitzmaurice, Barker and Arbitrator, Allen DeMarco offered the plaintiff a monetary consent award. The consent award stipulated the plaintiff voluntarily resign from her position at the (NYL) and never work for the State of New York.

In full resolution, the Defendants agreed give the plaintiff a monetary award and dismiss the Notice of Discipline and all the charges against the plaintiff. The plaintiff's resignation was irrevocable. DeMarco states "This award has been made in accordance with Section 33.4(f) of the CSEA/ASU State Contract. The required opportunity for representation was offered and no threats of reprisals or promises of special consideration was made by the agency representatives as an inducement to consent this Award". The monetary consent award offered to the plaintiff by DeMarco and the Defendants negates the validity of the charges levied against her.

11. DeMarco and the Defendants fabricated charges against the plaintiff in order to terminate her employment because she refused to accept the monetary consent award. Mike Ortiz, CSEA Representative wrote the plaintiff a letter that says "I am in receipt of your correspondence dated October 8, 2010. While I understand your decision not to accept the award, I want to remind you that the arbitrator indicated at the end of the hearing that there is a possibility he will terminate you from state service. It appears that the arbitrator may believe you fabricated these stories for some ulterior purpose and, therefore, you were dishonest and tried to bring disrepute on the agency. I urge you to give this settlement one more thought and to please call me upon receipt of this letter to advise of your final decision. I must give the arbitrator your decision by close of business on October 10, 2010. If I do not hear from you by 4:00 p.m., I will have no choice but to advise him that you have decided not to accept the award. Thank you for your attention to this matter". Ortiz, told the plaintiff he did not want to represent her. The monetary consent award offered to the plaintiff in exchange for dismissing the charges against her was not mentioned in DeMarco's

response or the Defendant's response to the Arbitration. DeMarco and the Defendant's

decision to willfully withhold the existence of the monetary consent award impeded the

due and proper administration of the law under which the proceeding was being had before

the Agency.

12. At Arbitration, the plaintiff submitted letters, as part of discovery, from her attorney, Robert

E. Harris. Harris wrote to the (NYL) Director's, Nancy Palumbo and Margaret DeFrancisco;

(NYL) management; (NYL) attorney, (NYL) personnel director and the plaintiff's union. The

letters demanded the Defendants stop escorting the plaintiff out of the (NYL) and to stop

sending her to the (EHS) every time she reported (NYL) employees were harassing her. The

plaintiff submitted her performance evaluations, as a Secretary I, as proof she worked out-

of-title at the (NYL) for years. The Secretary II's job duties were transferred to the plaintiff

because the Secretary II was training for grade 18 Web position; as evidenced in the

plaintiff's performance evaluations. The plaintiff had the highest score of 90 on the

Secretary II civil service list in the (NYL); and, she was on grade 18 lists. The Defendants

refused to promote the plaintiff. The plaintiff's union told her she would receive no union

assistance. The union refused to file out-of-title work on the plaintiff's behalf. After the

Defendants terminated the plaintiff, the Defendants hired a grade 15 to fill the plaintiff's

former position. The Defendants gave the plaintiff's job duty of responding to more than

10,000 emails a year from the questions@lottery email box to a grade 18 in the (NYL) legal

department. The grade 23 work, the plaintiff was responsible for, as part of her job duties,

was farmed out to various employees. The Defendants and DeMarco withheld exculpatory

evidence which violates the due process clause where the evidence is material either to

guilt or to punishment. Plaintiff contends, the exculpatory evidence is "material" if there is a reasonable probability that the outcome of the arbitration would have been different had numerous materials suppressed by DeMarco and the Defendants been disclosed. The evidence the plaintiff submitted at Arbitration includes statements of witnesses and physical evidence that conflicts with the Defendant's testimony and evidence that questions the credibility of the Defendants. DeMarco suppressed exculpatory material evidence in his decision to the Arbitration. DeMarco's decision to suppress exculpatory material secured the outcome of the Arbitration in the Defendants favor. The Defendant's evidence was based on "hearsay". Evidence that the Defendants could not and did not adequately substantiate. Evidence that would, usually, be disallowed in a court of law.

13. On October 15, 1997, Dr. Peter Andrus, NYS Department of Civil Service, Employee Health Service (EHS) states "It appears from review of the material enclosed that much of the friction described by Ms. Rivas and those at work, is between members of her and the office. Ms. Rivas previous employment with the State during the 14 years that she was employed with the State Health Department she had no difficulty there, for no such problems occur, as documented in her chart".

14. In April 1998, the plaintiff filed another complaint with the Defendants because she was enduring retaliation for having engaged in "protected activity". The Defendants escorted the plaintiff out of the (NYL) and ordered to be evaluated by (EHS). On May 27, 1998, Andrus, states "Again, in conclusion Ms. Rivas is fit for duty with no significant psychopathology. Addendum: In spite of the above summary, I would state to the Agency concerned, namely NYS Lottery, that they continue to keep a supervised but distant watch

on Zelma Rivas because of a noticed borderline tendency on one of her psychological tests, namely the MMPI-2 (questionnaire). Although this does not correlate with the remainder of her psychological testing, it is important enough for her to be watched, although my basic tenant is that she is still capable and fit for duty".

15. Andrus harassed the plaintiff and discriminated against her due to her race, ethnicity, national origin and citizenship status. Dr. Andrus used his interpretation of the results of the MMPI-2, a questionnaire many argue is valid for people who are English speaking people of European descent and not valid across cultural, ethnic and language barriers, as reason to initiate an agency-wide decree to harass, injure and endanger the life of the plaintiff. The plaintiff was made out to be a threat because she complained that she was harassed and discriminated against at the (NYL). Andrus abused the plaintiff's rights guaranteed by the U.S. Constitution. Andrus, violated the Due Process Clause of the Fourteenth Amendment of the United States Constitution "nor shall any State deprive any person of life, liberty, or property, without due process of law".

16. The plaintiff took her car in to an automotive shop, locally. While the plaintiff was waiting for new tires to be installed on her vehicle, a group of people arrived and began talking to a couple of the mechanics and the manager. The plaintiff left the automotive shop and stopped at a different garage. The plaintiff asked the employee to check her tires. The employee summoned the plaintiff over to her vehicle and said "you see those brand new shiny washers on your rotors, that were just put there, that's called attempted murder. My men did not put those washers on your rotors, you take them off yourself". The plaintiff took her car in for an oil change. The employee at the garage filed the plaintiff's brakes

9

down to the bare minimum. The manager got involved and asked the plaintiff not to call the police. The Defendants attempted to murder the plaintiff and her family. These incidences occurred while the plaintiff was working at (OTDA).

17. The plaintiff went on a date with a male. On the second date, the male asked the plaintiff what was going on because after meeting her he was getting stalked by people he believed to be law enforcement. The Defendant's harassed the plaintiff's date. A male acquaintance told the plaintiff he was offered $1,000 to brutally sodomize and rape her. The Defendants paid the male acquaintance to physically injure the plaintiff. Plaintiff went on a date and the male became inebriated. The male told the plaintiff he was offed six-figures by the (NYL) to murder her. These incidences occurred while plaintiff was working at (OTDA). The plaintiff has been forced to remain single out of fear of being murdered by the Defendant's. The Defendants stole the plaintiff's right to be in a safe relationship with a partner. The Defendants and (OTDA) management took direct steps to kill the plaintiff; with the specific intent to kill her.

18. The plaintiff no longer has any girlfriends in her life because the Defendants harassed them all. The Defendants went to some of the plaintiff's girlfriend's jobs. The women's supervisors and co-workers harassed them because of their association with the plaintiff. An established pattern of practice by the Defendants. Some of the women grew up, as children, together with the plaintiff. Not one girlfriend remains in the plaintiff's life. The plaintiff's bridal party and her children's god parents want nothing to do with the plaintiff or her children for the same reason. The Defendants harassed the plaintiff's friends and family as a means to isolate her. Plaintiff contends, if the Defendants and (OTDA) finally succeed

10

and murder her and her children, no one will report the plaintiff and her children are missing.

19. The Defendants tried to make the plaintiff hate her country, The United States of America. As a United States citizen who lives in the United States, the United States that cherishes, honors and respects the God-given rights of individual human beings to secure and protect life and liberty, the plaintiff's values and freedoms has been seized by the Defendants.

20. The outrageous actions by the Defendants attempted murder, attempted abduction, attempted kidnapping, attempted arrest, attempts made to plant illegal drugs on the plaintiff's person at work, stalking, threats, harassment, unlawful surveillance, tracking and monitoring, for over two decades of the Plaintiff and her children, United States Citizens and lawful permanent residents, is an affront to the American ideals of freedom, human rights and rule of law. The Defendants continue to engage in a pattern and practice of conduct that depraves the plaintiff of rights protected by the U.S. Constitution and the laws of the U.S. The Defendants continue to force the plaintiff to endure grotesque cruelties in the name of justice. The Defendants and (OTDA) management continue attempting to murder the plaintiff, have her arrested and fire her in order to permanently silence her. Plaintiff has been willfully deprived of her rights and privileges protected by the Constitution and laws of the U.S. and 42 U.S. Code § 1983.

21. The following incidences at the Office of Temporary and Disability Assistance (OTDA) began when the plaintiff was hired in December 2012 through 2020, prior to the pandemic; and, continues after the pandemic. The plaintiff was under unlawful surveillance at the (NYL). Plaintiff contends, she is under unlawful surveillance at (OTDA).

11

22. Immediately after the plaintiff was hired by (OTDA) she was stalked, harassed, bullied and disparaged. In the 8 ½ years the plaintiff has worked at (OTDA), not one employee has any working relationship with her; no workplace associates. The plaintiff is vilified, targeted and deliberately isolated. (OTDA) employees want nothing to do with the plaintiff; except to stalk, harass and bully her because employees are rewarded with State promotions for injuring the plaintiff. All of the female Caucasian employees and some of the Caucasian men hired to work on the 15th floor at (OTDA) stalk the plaintiff with absolute impunity because the behavior is allowed. (OTDA) employees tried to stop the plaintiff from fulfilling her contract with the State to perform her job duties by continually sabotaging her work to discredit her and have her fired. After processing a fair hearing, the agency, aid status, code, are changed and the plaintiff's comments in the fair hearings are deleted. The plaintiff is given misinformation and work information is withheld. In a desperate attempt to remain employed, plaintiff is continually correcting the sabotage in her work. Routinely, (OTDA) employees target, harass and bully the plaintiff in their emails to her. Plaintiff complained to (OTDA) management advising them she is stalked, harassed, bullied and her work is sabotaged. (OTDA) management threatened the plaintiff with disciplinary action if she continues filing complaints that she is harassed by (OTDA) employees. A violation of the plaintiff's First Amendment rights. Plaintiff is the subject of retaliation by (OTDA) management for reporting the abuse.

23. When the plaintiff talks about individual (OTDA) employees in her apartment or elsewhere (plaintiff's cell phone) the next day, at the office, (OTDA) employees retaliate. The employees react to what the plaintiff says about them in her apartment or elsewhere by

standing inches in front of her face and stalking her on the 15th floor or stalking her to the ladies room on the 15th floor. Eavesdropping, a Class E Felony, has allowed (OTDA) employees the opportunity to gain information about the plaintiff's personal life and information about the plaintiff's children. The plaintiff's personal information is repeated by (OTDA) employees in the office. As a result, the stalking the plaintiff endures at (OTDA), is more insulting, interfering, threatening, extensive and protracted.

24. Every time the plaintiff gets up from her seat to use the ladies room on the 15th floor at (OTDA), 3 to 5 women get up from their seats and stalk the plaintiff to the ladies' room; visually excited and laughing. When plaintiff uses the ladies room on the other floors, the 14th, 13th, 12th, 11th, 10th, 9th, to escape the stalking on the 15th floor, the women from the other floors stalk the plaintiff to the ladies' room; visually excited and laughing. When plaintiff returns to her desk, after getting stalked, she has difficulty focusing on the work because her brain is fighting to stay alive. The stalking the plaintiff is subjected to at (OTDA) is similar to a reenactment of a slave running for her life.

25. On August 11, 2019, the plaintiff visited the Ford Theater in Washington D.C. While reading a kiosk at the Ford Theatre, a group of people came in and immediately began stalking the plaintiff. The plaintiff could no longer focus on reading the information on the kiosk. The group of people stalking the plaintiff at the Ford Theatre is visually identical, to the daily stalking the plaintiff is forced to endure on the 15th floor at (OTDA). The Defendants used the ethnic and racial background of the plaintiff as proxy to identify her as the target.

26. When the plaintiff went on a job interview at (OTDA), she was asked if a grade 14 was the highest grade she was appointed to in State service with a Master's Degree in Public

13

Administration. The entire interview panel started laughing at the plaintiff. Plaintiff stopped going on job interviews at (OTDA) because she was continually subjected to a Litany of unlawful employment practices.

27. In the summer of 2019, plaintiff attended the (OTDA) office picnic. Hundreds of (OTDA) employees attended the picnic. The plaintiff was greeted with stares and glares and snickering remarks as she walked by (OTDA) employees. Not one (OTDA) employee spoke to the plaintiff. Plaintiff sat by herself, ate her lunch and left the picnic. Plaintiff is targeted by (OTDA) employees.

28. On July 14, 2021, at (OTDA), the plaintiff went to lunch at 1:30 PM. The plaintiff got on the elevator. The elevator stopped on the 11th floor and several people got on. When the elevator reached the lobby floor, everyone exited the elevator.  The female, a Caucasian, who got on the elevator from the 11th floor, started stalking the plaintiff on the lobby floor.

29. The plaintiff was stalked, harassed and bullied at the (NYL). The plaintiff is stalked, harassed and bullied at her current place of employment, the Office of Temporary and Disability Assistance (OTDA). The identical criminal actions the plaintiff has been subjected to at both state agencies is not a "mere coincidence" but rather, evidence that a prohibitive linkage exists between the (NYL) and the Office of Temporary and Disability Assistance (OTDA). (OTDA) management are negligent by not controlling the working conditions and allowing the hostile workplace environment to persist. (OTDA) management took no action to stop the repeated victimization of the plaintiff by numerous (OTDA) employees stalking and harassing her on a daily basis. The stalking directed at the plaintiff causes her to fear for her safety and suffer substantial emotional and mental distress. (OTDA) management took no

action to stop the unlawful discriminatory practices directed at the plaintiff. (OTDA) management failed to protect the fundamental human rights of the plaintiff's life, liberty and physical safety.

30. Plaintiff plausibly contends vicarious liability on the part of (OTDA) management's actions. (OTDA) management and (OTDA) employees willfully injured, intimidated and interfered in the plaintiff's right to State employment and Federal Protected Activities because of her race, color and national origin

31. The evidence provided herewith is undeniable proof that these adverse employment actions, ongoing discrimination, retaliation, did not exist nor occur, prior to the plaintiff's employment with the (NYL). Plaintiff's allegations support a plausible inference that these similar actions taken by (OTDA) employees provides credible evidence for a retaliation claim that can be imputed to the Defendants. Title VII retaliation causes of action may be based upon actions taken against the plaintiff following her unlawful termination from employment with the Defendants. Plaintiff contends, in this instance, the Defendant's post-employment conduct towards the plaintiff falls within the scope of Title VII. The aforesaid acts, policies, practices and procedures were intentional and motivated by a prohibited invidious discriminatory animus and are in violation of 42 U.S. Code § 1983.

## THE FIRST CAUSE OF ACTION

32. The plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 31 as though fully and set forth herein.

33. Roger W. Kinsey, Assistant Attorney General ("AAG"), representing the NYS Attorney General's Office, the State of New York, appearing for the Defendants, the New York Lottery

(NYL), violated Title VII of the Civil Rights Act of 1964 ("Title VII") which prohibits discrimination on the basis of race, color, religion, sex or national origin on February 21, 2001 at the U.S. District Court of the Northern District, Court of the Northern District of New York, Examination Before Trial (EBT) of plaintiff, Zelma Rivas, held at the State Office of the Attorney General, Justice Building, The Capitol, Albany New York. In attendance: Roger W. Kinsey, ("AAG"); Zelma Rivas, Plaintiff; Robert. E. Harris, Esq., plaintiff's attorney and Timothy Connick, Esq., representative for CSEA.

34. Roger W. Kinsey, ("AAG"), violated Title VII of the Civil Rights Act of 1964 ("Title VII") when he questioned the plaintiff, Zelma Rivas, at the Examination Before Trial (EBT) as follows: Kinsey: Are you married? Plaintiff: I'm divorced. Kinsey: Children? Plaintiff: Yes. Kinsey: Boy and a girl? Two boys. Two girls? Plaintiff: A boy and a girl. Kinsey: And, ma'am, your ethic background? Plaintiff: Hispanic. Kinsey: Are you a citizen of the United States? Plaintiff: Yes, I am. Kinsey: Naturalized or born here? Plaintiff: Born here. Kinsey: And where were you born? Plaintiff: I was born in New York City. Kinsey: And do you have other family in New York City? Plaintiff: Yes, I do. Kinsey: Do you have other family here in the area? Plaintiff: Yes, I do. Kinsey: Where do you currently reside, ma'am? Plaintiff: I reside in Ghent, New York. Kinsey: Okay. And how long have you been living there? Plaintiff: Three years. Kinsey: Do you own or rent? Plaintiff: I just live there. Kinsey: Does the house belong to a relative? Plaintiff: Yes, it does...Kinsey: Are you currently being treated by a psychologist or psychiatrist? Plaintiff: No I'm not. Kinsey: Have you ever been treated by a psychologist or psychiatrist? Plaintiff: NYS Health —I need a moment please. Kinsey: And no past history of emotional or psychological problems? Plaintiff: No. Kinsey: Okay. Any past problems with

memory loss? Plaintiff: No. Kinsey: any current problems with memory loss? Plaintiff: No.
Kinsey, deliberated asked the plaintiff questions that are problematic with the Civil Rights
Act of 1964. The whole wing of medicine is based on confidentiality. Kinsey violated the
HIPPA Privacy Rule when he asked the plaintiff protected health information (PHI). Kinsey
violated Title VII of the Civil Rights Act of 1964 ("Title VII"), trampled on the plaintiff's civil
rights and harassed her. Kinsey and the Defendant's actions, demonstrates their attempts
at seditious conspiracy – opposing the government by force.

35. Kinsey asked the plaintiff if she had ever been treated by a psychologist or psychiatrist
because (NYL) management abused their positions of authority by repeatedly ordering the
plaintiff to be examined by a psychologist and psychiatrist at the NYS Department of Civil
Service, Employee Health Service (EHS) every time she complained she was harassed and
discriminated against by (NYL) employees. (NYL) management used the NYS Department of
Civil Service, Employee Health Service (EHS) as a means to publicly humiliate the plaintiff
and oust her out of the (NYL); from her initial complaint in 1997 until her unlawful discharge
in October 2010. In 1998, management was advised the plaintiff was found fit for duty by
the NYS Department of Civil Service (EHS). As punishment for complaining about
harassment and discrimination, the Defendants constructed an isolation room, specifically
for the plaintiff. The plaintiff was detained in the isolation room, on the lobby floor in the
(NYL) building; from July 20, 1998 through March 6, 2000. The isolation room was hidden
from view. The security staff, had to pass by the plaintiff to get to the security desk. The
security staff are not (NYL) employees. The plaintiff was forbidden to associate with (NYL)
employees. For months, the plaintiff was not given any work while in the isolation room.

The plaintiff was confined to the ground floor. The plaintiff had no access to any offices in the (NYL) building. The plaintiff had no access to the (NYL) bulletin board located on the third floor. Posted on the bulletin board: federal and state laws; union information; (NYL) information; job promotions. On March 6, 2000, the day before the plaintiff's Civil Rights hearing at the NYS Division of Human Rights, the plaintiff was moved out of the isolation room by the (NYL) attorney and the affirmative action officer; into the Press and Community Relations Office. The following day, at the civil rights hearing, held at the NYS Division of Human Rights, the Defendants were asked to identify the races of the employees the plaintiff worked with. The Defendants responded by saying the plaintiff worked in an office with two other Hispanics, besides herself, the affirmative action officer, a male and the (NYL's) highest emcee, a female. The Defendants suppressed the fact that the plaintiff was unlawfully detained in an isolation room for more than 20 months from the NYS Division of Human Rights. The Defendants failed to disclose critically exculpatory material. Kinsey submitted Exhibit H, a blue print of the isolation room, in his Deposition. While in the isolation room, numerous attempts were made to murder the plaintiff and her children; attempts to arrest the plaintiff and attempts to fire the plaintiff. Plaintiff contends the unlawful detainment violated her civil rights, human rights, the Eighth Amendment, Cruel and Unusual Punishment; and, the Fourteenth Amendment, nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. The Defendants committed an act of restraint on the plaintiff by confining her in a bounded area, the isolation room.  Plaintiff's refers to provisions of the law invoked in her complaint asserting violations of the

18

Fourteenth Amendment and U.S.C. § 1983. Plaintiff articulates how her allegations state viable claims under these provisions. The (NYL), as a state agency would be immune under the Eleventh Amendment from any such claim. However, the plaintiff is seeking relief from the state officials involved; rather than against the state itself. Plaintiff contends, the primary rationale through which the strictures of the Eleventh Amendment are independent, is that a state official possesses no official capacity when acting illegally and consequently can derive no protection from an unconstitutional statute of a state. The Eleventh Amendment permits citizens of any state to seek injunctions against state officials in federal court to end a continuing violation of federal law. Plaintiff contends, for purposes of sovereign immunity, a suit against a state official is not a suit against the government.

36. The violation of Title VII of the Civil Rights Act of 1964 ("Title VII") at the Examination Before Trial (EBT) is unconstitutional; and, if so, the use of the name of the (NYL) to enforce unconstitutional acts to the injury of the plaintiff is a proceeding without the authority of, and one which does not affect, the state in its sovereign or governmental capacity. They are simply illegal acts on the part of a state official, in attempting, by the use of the name of the (NYL), to justify the violation of State and Federal laws, and as such, should be considered void, because it's unconstitutional. State officials should be subject to the consequences of their individual conduct and held liable for the injuries they cause the plaintiff. The plaintiff contends, her claim does not fail as a matter of law. The plaintiff was deprived of her rights, privileges and immunities secured by the Constitution and laws of the U.S. and 42 U.S. Code § 1983.

37. Plaintiff states a claim of discrimination and retaliation committed by Kinsey and the Defendants. The Defendants harassed the plaintiff and unlawfully detained her in an isolation room; subjecting her to a workplace permeated discriminatory intimidation, ridicule and insult. Plaintiff states a claim of a hostile work environment. The Defendants actions altered the plaintiff's employment and ruined her life. Kinsey and the Defendants did not pursue a course of conduct which would not raise suspicion among the public that they are not engaged in acts that are in violation of their trust. Kinsey and the Defendants actions raises a right to relief above the speculative level. The legal conclusions provided in the framework of this complaint is supported by factual allegations. Plaintiff provides well pleaded factual allegations that plausibly give rise to an entitlement of relief.

38. To state a claim upon which relief can be granted, plaintiff's complaint contains, among other things a short and plain statement of claim of the claim showing that the pleader is entitled to relief. Plaintiff adequately demonstrates entitlement to the relief sought. Plaintiff does not provide threadbare recitals of the elements of a cause of action supported merely by conclusory statements. Plaintiff provides sufficient factual matter to state a claim to relief that is plausible on its face. The plaintiff's well pleaded facts infers more than the mere possibility of misconduct, the plaintiff's complaint has alleged and shown, that she is entitled to relief.

39. The NYS Attorney General's Office is required to enforce and obey the Constitution and laws of the United States, to uphold the integrity of the NYS Attorney General's Office, to avoid impropriety and the appearance of impropriety, to perform the duties of the NYS Attorney General's Office impartially. The violation of Title VII of the Civil Rights Act of 1964 ("Title

20

VII") and harassment of the plaintiff at the (EBT), undermined the confidence in the integrity of the NYS Attorney General's Office and betrays the trust of the people of the State of New York; thereby, bringing disrepute on the Office of the Attorney General.

40. Plaintiff has good faith belief that the Defendant's violated federal and state laws including prohibitions related to improper influence, abuse of office, bribery and other potential criminal offenses. The plaintiff had knowledge of the facts relevant to these offenses; and, submitted evidence concerning those facts to the appropriate authorities. On June 11, 2019, Deputy Solicitor General, Andrea Oser, signed a Supreme Court of the United States WAIVER, "Supreme Court Case Number 18-1473, Zelma Rivas versus New York State Lottery. I DO NOT INTEND TO FILE A RESPONSE to the petition for writ of certiorari unless one is requested by the Court. Please enter my appearance as Counsel of Record for all respondents. I am a member of the Bar of the Supreme Court of the United States. Deputy Solicitor General, Andrea Oser, NYS Attorney General's Office, The Capitol, Albany New York; (518) 776-2046. Email: andea.oser@ag.ny.gov".

41. The aforesaid acts, policies, practices and procedures were intentional and motivated by a prohibited invidious discriminatory animus and are in violation of 42 U.S. Code § 1983. By reason of the foregoing, the plaintiff is entitled to the reversal of her unlawful termination by the Defendants and the reinstatement of her State position together with back pay and all emoluments.

### THE SECOND CAUSE OF ACTION

42. The plaintiff repeats and realleges each and every allegation set forth in paragraphs 33 through 41 as though fully and set forth herein.

43. The precondition to filing a Title VII claim in Federal Court requires the plaintiff pursue
available administrative remedies and file a timely complaint with the Equal Employment
Opportunity Commission ("EEOC"). The plaintiff filed timely charges with the ("EEOC") in
Buffalo, New York. On April 9, 2013, David Ging, Investigator, representing the ("EEOC")
states "the NYS Lottery made the initial decision to fire you, years ago, and never changed
its position. The 300-day clock is not stopped while you exhaust appeals. The decision has
still been made. Whether you win or lose any appeals NYS Lottery's decision was made. In
addition, you have had your chance to have NYS Lottery's action investigated. You
previously filed an Equal Employment Opportunity Commission ("EEOC") charge of
discrimination regarding this issue. The fact that you do not agree with Equal Employment
Opportunity Commission ("EEOC's") decision in that case does not mean that you can keep
applying for more administrative investigations. For these reasons, it is unlikely we would
conduct an investigation into your complaint if you were to go forward with filing a formal
charge of discrimination. Nevertheless, if you choose to, you may still file a charge of
discrimination. Though it is likely that the Equal Employment Opportunity Commission
("EEOC") will dismiss your charge without investigation". The plaintiff was retaliated against
and harassed for previously having filed (EEO) charges of discrimination; and, for asserting
her (EEO) rights, protected activity, to be free from employment discrimination including
harassment. The ("EEOC's") decision to deny the plaintiff the right to file any further
charges of discrimination or investigate her complaints, negated the plaintiff's right to seek
administrative remedies. The plaintiff was deprived of the rights and privileges protected by
the Constitution and laws of the U.S. and rights under color of law.

44. Plaintiff contends she is entitled to the benefit of the continuing violation exception, which provides that if a Title VII plaintiff files an Equal Employment Opportunity Commission ("EEOC") charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone. The ("EEOC") denied the plaintiff the right to seek administrative remedies by refusing to conduct investigations into her complaints and dismissing her complaints without investigation when she filed charges of discrimination against the (NYL) in 1998; 1999; 2000; 2001; 2006; 2009; 2013, 2016. The plaintiff was denied the fair right of legal procedures. The plaintiff alleges both the existence of an ongoing policy of discrimination and non-time barred acts taken in furtherance of that policy. The Title VII exhaustion requirements, and their filing deadlines, operate as an affirmative defense. However, Title VII exhaustion requirements cannot be adhered to when Ging and the Defendants abused their authority by intentionally interfering and obstructing the administrative process of the plaintiff's right to pursue administrative remedies at the Equal Employment Opportunity Commission ("EEOC"). The plaintiff was denied the legal right to exhaust available administrative remedies before being permitted to litigate in the courts. This demonstrates an exception to the exhaustion of administrative remedies. Under these circumstances, although a valid administrative review process exists, it is readily apparent that the plaintiff was unlikely to receive an unbiased response. It would be an exercise of futility; thereby, demonstrating a recognized exception to the exhaustion requirement. The plaintiff was denied rights to seek

administrative remedies; and, equal protection of the laws on account of her ethnicity, race, color and national origin.

45. On February 8, 2006, at the NYS Division of Human Rights, Albany New York. In attendance, Gregg T. Johnson Assistant Attorney General ("AAG"); Zelma Rivas, Plaintiff; Lisa Fitzmaurice, Personnel Director, (NYL); and Carolyn Hapeman, Supervisor, (NYL).  Johnson, started the meeting by addressing the plaintiff, Zelma Rivas, as follows: "no conciliation". The Director of the NYS Division of Human Rights retaliated against the plaintiff when he responded by saying the plaintiff had previously filed an Equal Employment Opportunity Commission ("EEOC") charge of discrimination against the (NYL). Johnson violated Title VII of the Civil Rights Act of 1964 ("Title VII") when he refused to conciliate with the plaintiff.

46. The Defendants conspired to deprive the plaintiff of equal protection under law, privileges, and in furtherance of the conspiracy, injury in the form of Constitutional deprivations flowing from the acts. The Defendants continue to monitor, track and harass the plaintiff and her family. The plaintiff filed hundreds of complaints with the U.S. Department of Justice, FBI, local law enforcement and state agencies; informing them of the Defendants criminal actions taken against her and her family. The Defendants willfully injured, intimidated and interfered in the plaintiff's right to enjoy life, safety, security, liberty, State employment, Federal Protected Activities, because of her race, color and national origin. The aforesaid acts, policies, practices and procedures were intentional and motivated by a prohibited invidious discriminatory animus and are in violation of 42 U.S. Code § 1983. By reason of the foregoing, the plaintiff is entitled to the reversal of her termination by the

Defendants and the reinstatement of her State position together with back pay and all emoluments.

47. **PRAYER FOR RELIEF**

**WHEREFORE,** plaintiff(s) request(s) that this court grants the following relief:

- Sum of money equal to back pay, including increments allotted to my position from the date of termination to the present.

- Compulsory damage in the sum of $1,000,000.

- Further equitable and injunctive relief as the court deems necessary and appropriate to correct the conditions of discrimination complained of herein.


I declare under penalty of perjury that the foregoing is true and correct.

DATED: 8|18|21

Signature of Plaintiff(s)

AMY GRAZDA
Notary Public - State of New York
No. 01GR6339526
Qualified in Saratoga
My Commission Exp. 04/04/2024